IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs September 6, 2018

**LARRY JOHNSON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 98-06749    James M. Lammey, Jr., Judge**

---

**No. W2017-00503-CCA-R3-ECN**

---

The Petitioner, Larry Johnson, appeals from the Shelby County Criminal Court's denial of his petition for a writ of error coram nobis from his 1999 conviction for first degree premeditated murder and his sentence of life imprisonment. The Petitioner contends that the court erred by denying relief. We affirm the judgment of the coram nobis court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

Eric J. Montierth, Memphis, Tennessee, for the appellant, Larry Johnson.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Gavin Smith, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the shooting death of Kelvert Hailey[1], who along with the Petitioner and his codefendant, Johnie Jefferson, were members of the Gangster Disciples gang. *See State v. Johnie Jefferson and Larry Johnson*, Nos. W1999-00747-CCA-R3-CD and W2000-01970-CCA-R3-CO, 2001 WL 1218287 (Tenn. Crim. App. Oct. 21, 2001), *perm. app. denied* (Tenn. Mar. 11, 2002). The Petitioner and codefendant Jefferson were each convicted of first degree premediated murder at a joint trial, and they appealed. In its opinion affirming the convictions, this court summarized the facts as follows:

---

[1] The spelling of the victim's name appears in the record as "Hailey" and "Haley." For consistency, we use the spelling reflected in this court's previous opinion.

Raniko Lindsey Bonner testified that in November 1997, she was living with her children and Marlo Richardson at Hurt Village Apartments. Bonner testified that at the time, she knew a man that she referred to as "MacLarry," whom she identified in court as Larry Johnson. Bonner testified that she was also associated with a man that she referred to as "J-Rock," whom she identified in court as Johnie Jefferson. According to Bonner, both men were members of a gang called the [Gangster] Disciples. At that time, Bonner testified that she was dating a man named Tony Phillips (a.k.a. "TMoney"). According to Bonner, Phillips was the leader of the [Gangster] Disciples, although Bonner claimed she did not know that at the time of the offense.

Bonner testified that on November 3, 1997, she was at home with her mother, Phillips, Jefferson, Richardson, and Richardson's boyfriend, Dushack. Bonner testified that there were knocks at her front and back doors. Bonner opened the back door and saw Larry Johnson and Marcus Glass (a.k.a. "Sporty"). Bonner then opened the front door to find Robert Walker. Bonner testified that Walker gave her some alcohol and asked her to fix him a sandwich. After Bonner gave Walker the sandwich, Glass called Jefferson away from the table where he was sitting. Jefferson went to the back of the apartment and spoke to Johnson and Glass.

Bonner testified that after the conversation, she asked Johnson to take her to her aunt's house. Johnson said that he couldn't because "he had some business to take care of." Bonner went upstairs to straighten up her room, and when she came back, Jefferson, Johnson and Glass had all gone.

Bonner testified that she saw Johnson the next night when he and Glass returned to Bonner's apartment. Bonner testified that the Defendants told her that "one of the folks was found dead in the park." Bonner testified that "folks" refers to members of the [Gangster] Disciples.

Marcus Rydell Glass (a.k.a. "Sporty") testified that he was charged in this case with facilitation of the murder in the first degree of Kelvert Hailey, the victim in this case. Glass testified that he had been a member of the [Gangster] Disciples since 1989. Glass testified that there is an organizational structure to the gang in which he stated that he held the position of "chief of security." According to Glass, there are certain rules in the gang, and those members that do not follow the rules are punished. As "chief of security" for the city, Glass worked under Tony Phillips, who is the "overseer." Robert Walker, Johnie Jefferson and Larry Johnson were also "chief[s] of security." One of the duties of a "chief of security" is "handling violations."

Glass testified that he knew the victim as a member of the [Gangster] Disciples but did not know if the victim held a position within the organization. According to Glass, the victim had violated one of the rules of the [Gangster] Disciples. Glass testified that on November 3, 1997, Larry Johnson called him and asked him to come to the home of Johnson's girlfriend. Johnson told Glass that the victim was there. At some point after Glass arrived, the victim left. Glass and Johnson left and found the victim near where Johnson's car had been parked. The victim asked if he could get a ride to a club called Ebony Lace. According to Glass, the victim did not know that he was in trouble.

Johnson, Glass and the victim left the apartment complex and went to Burger King. At the restaurant, Johnson approached Glass and told him that "instead of dropping [the victim] off we're going to go get a bag of weed so we can smoke it." The three men then went to an apartment complex called Hurt Village. Once there, Glass and Johnson went into an apartment that belonged to Tony Phillips' girlfriend, Raniko Bonner (a.k.a. "Nikki"). Jefferson, Phillips, and Walker (a.k.a. "McRob") were all there. Jefferson and Walker told Phillips that the victim was in the car. Glass testified that he was carrying a .380 Smith and Wesson gun; that Johnson was carrying a .357 Smith and Wesson revolver; and that Jefferson was carrying a nine-millimeter Smith and Wesson gun. According to Glass, all of the guns were provided by Tony Phillips.

Johnson, Jefferson and Glass left the apartment. While standing outside, Johnson explained to Jefferson that he had "set[] . . . [the victim] up" by telling the victim that they were going to get some marijuana. The three men then got in Johnson's car along with the victim. With Johnson driving, the men went to Levi Road in Whitehaven. When asked why they went to Levi Road, Glass testified that he guessed it was "to kill [the victim]." Johnson parked the car on the side of Levi Road. Jefferson then got out of the car and said that he had to urinate; however, he instead opened the back door and pulled the victim out of the car at gunpoint. Glass testified that the victim told him to tell them that he was begging for his life. Johnson tried to help Jefferson pull the victim out of the car, and at that point, the victim tried to run.

Glass testified that when the victim started to run, Johnson shot him twice in the back. The victim tried to run to the left into the woods, but he fell. Jefferson took the gun from Johnson and shot the victim four times while he

-3-

was lying on the ground. Jefferson then got his own gun and shot the victim twice more. Jefferson and Johnson got back in the car, and Jefferson said that the victim was "broke." Glass remained in the car during the incident. Glass testified that he was in trouble with the organization for not participating in the murder.

Glass testified that he went to Tony Phillips' house the next day to give him back his gun. Phillips wanted the guns back so that he could "drill them out." According to Glass, Phillips wanted to drill the grooves out of the gun to change its ballistics. Johnson and Jefferson were both at Phillips' house, having the same thing done to their guns. Glass identified in court the guns used to kill the victim as the ones that Jefferson and Johnson used on November 3, 1997.

After the murder, Glass left town and went to Chicago. When Glass called his mother, she told him that the Fugitive Squad was looking for him. Glass called Phillips. According to Glass, Phillips told him "what he was going to do to [Glass]" if he went to the authorities. After a week in Chicago, Glass went back to Memphis where he again talked to Phillips. Glass testified that Phillips threatened him and his family.

Robert Walker testified that he was raised in Detroit and that while there, he became a member of the Black [Gangster] Disciples. Walker testified that the Black [Gangster] Disciples was different from the [Gangster] Disciples in Memphis. When Walker moved to Memphis in 1996, he joined the [Gangster] Disciples. Walker testified that he eventually held the position of "chief security" of the city and reported directly to the "overseer," Tony Phillips. Walker testified that Jefferson and Johnson were also "chief[s] of security."

Walker, with the aid of a chart, testified regarding the organizational structure of the [Gangster] Disciples. According to Walker, Phillips was the "overseer" of the organization in Memphis. Jefferson was a "chief of security" in charge of enforcement, and Johnson and Glass were Jefferson's two assistants. Walker testified that he was also a "chief of security" in charge of growth and development. Walker explained that as part of his job within the organization, he investigated and punished violations. Walker testified that he and Jefferson frequently met at Phillip's residence to discuss gang business.

-4-

Regarding Jefferson's position as an "enforcer," Walker testified that if Phillips "tell[s] him to go out there and kill somebody, he'll do it." According to Walker, there are some violations within the organization that necessarily result in death. One of those violations is "1919," which is when a gang member gives a statement to police. Walker said that he was aware that the victim was in trouble with the organization because he had broken "1919."

Walker testified that on November 3, 1997, he, Phillips, Jefferson, and Richardson were all at the home of Raniko Bonner, Walker's sister. Johnson and Glass arrived later in Johnson's car. Walker testified that Johnson was carrying a .357 revolver and Glass was carrying a ".380." Walker testified that Johnson talked to Phillips and told him that they had the victim in the car. According to Walker, Phillips told Jefferson to "take care of his business" and winked his right eye. Walker testified that the winking of the right eye signified that Jefferson was supposed to "put [the victim] to sleep." Jefferson then left with Glass and Johnson. Walker testified that he walked outside with them, and Johnson told him that "he was fixing to go kill dude."

Marlo Richardson (a.k.a. "Loony Toon") testified that she talked to Marcus Glass after the death of the victim and that Glass told her that "he didn't mean it to happen that way." According to Richardson, Glass said that he shot the victim. Richardson testified that [she] lived with Raniko Bonner at Hurt Village Apartments. Richardson testified that she remembered the day that Phillips, Walker, Jefferson, and Glass were all at Bonner's apartment. Richardson testified that Johnson was not there. Richardson testified that Glass, Jefferson, and Walker all left. Although Richardson testified at trial that Johnson was not at Bonner's place on November 4, 1997, she admitted in her statement that Phillips, Walker, Johnson, Glass and Jefferson were all there, and she recalled that they were discussing that someone had been killed.

Alvin Odom testified that on November 4, 1997, he was riding in a car with his wife. The couple had just dropped off their children at elementary school and were traveling on Levi Road taking their daughter to day care. While on Levi Road Odom saw a man, later identified as the victim, Kelvert Hailey, lying in a ditch. He first thought that the man had just passed out and asked his wife if they should try to wake him up. His wife agreed, and they turned the car around and headed back towards where they had seen the man. After they pulled up beside the man, Odom began to get out of his car when his wife started "shaking and crying." She said that she saw holes in the man's head. The Odoms immediately went back to the elementary school where they had dropped off their children and told a teacher what they had

seen. The teacher then called the police, and the Odoms returned to where they had found the body and waited for the police.

Byron Braxton of the Memphis Police Department responded to the call and arrived on the scene around 7:25 a.m. or 7:30 a.m. Braxton spoke to the Odoms and observed the crime scene. According to Braxton, the victim was "a male black wearing white tennis shoes, green jeans and a red and white jacket, laying in a semi fetal position, face down in a ditch on the north side of Levi." Braxton said that he observed a large hole in the back of the victim's head. Braxton testified that the area in which the victim was found was "relatively secluded," with no houses in the immediate vicinity and only a couple of businesses nearby. In addition to the body, Braxton observed two handgun shell casings near the body. Braxton also noticed "a scuff or some type of skid mark in the dirt, in line with the body in the ditch." A tooth was also found at the crime scene.

Officer Danny James, a member of the Crime Scene Unit of the Memphis Police Department, testified that he collected evidence at the crime scene. James testified that the victim's shoe print was on the pavement near the ditch where he was found. According to James, there were "little burs [sic] on [the victim's] lower pants and shoes and socks," which he believed someone would get if they walked or ran through weeds. Officer James took photographs of the victim's body, including a photograph of the victim's hand, which was clinched in a fist. Officer James testified that he did not find any physical evidence such as fingerprints, hair, or clothing fibers that belonged to the Defendants. Officer Shan Allen Tracy of the Memphis Police Department testified that a bullet was found in the dirt underneath where the victim's head had been.

Sergeant R. D. Roleson of the Memphis Police Department testified that he was assigned to locate the witnesses in this case. Larry Johnson was one of the individuals whom Roleson was assigned to locate. After talking to a witness named Melissa Looney at the homicide office, Sergeant Roleson requested that Looney call Larry Johnson's beeper. The number from which Johnson returned the call was traced, and the police then went to that location. A consent to search form for the house was obtained, but Johnson was not there. While there, Sergeant Roleson learned that Johnson's car was in the parking lot. Roleson testified that he had the car towed to the crime scene building to be processed. Roleson testified that he had the car towed because based on his investigation, it was likely that the victim was last seen in Johnson's vehicle.

A warrant was later obtained to search Johnson's vehicle. The warrant was based on the affidavit of Sergeant O. W. Stewart of the Memphis Police Department. The affidavit states, in pertinent part:

> [A]ffiant has received information relating to the shooting death of Kelvert Hailey from a reliable witness who advised that Larry Johnson and Marcus Glass were responsible for the death of Kelvert Hailey. This witness did see Marcus Glass armed with a black automatic handgun on Thursday, November 6, 1997 two days after the body was recovered on Tuesday, November 4, 1997 at 7:32 a.m. This reliable witness gave information that on Friday, October 31, 1997 this witness saw Larry Johnson in possession of a chrome revolver. The victim had been shot six times in the back and head and only two spent casings from a 9mm automatic were found on the scene of the Homicide, indicating that another weapon was involved. This witness also indicated that Marcus Glass and Larry Johnson were together on Monday night, November 3, 1997, until the early morning hours of Tuesday, November 4, 1997, were occupying Larry Johnson's 1984 Buick Lasabre, VIN# 1G4AN69Y8EX422903 and were with the victim just prior to the victim's death.

Officer Barry G. Lane of the Memphis Police Department, a member of the Crime Scene Unit, processed Larry Johnson's car. A revolver was found in its case in the trunk of the car. Lane also confiscated six live rounds from the car and a pawn shop ticket "in regards to the nine-millimeter pistol." Officer Lane obtained fingerprints from a photograph that was found in the vehicle. He also obtained fingerprints from the rearview mirror and a cologne bottle found inside. James Hill, a latent print examiner with the Memphis Police Department, testified that the fingerprints on the rearview mirror belonged to Larry Johnson and that the fingerprints on the photograph belonged to Tony Phillips.

Ronnie McWilliams testified that he worked as an investigator on the anti-gang team in the Attorney General's office. McWilliams testified that on October 6, 1997, he interviewed the victim regarding a robbery investigation. McWilliams talked to the victim "to gain knowledge of gangs in his area and what he knew about it." McWilliams testified that the victim indicated that he was a member of the [Gangster] Disciples, but he did not discuss the structure

-7-

of the organization. McWilliams also testified that he participated in the execution of an Federal Bureau of Investigation (F.B.I.) search warrant on Tony Phillip's residence. McWilliams testified that he found a drill and drill bits in the residence.

Robert Daniel Royce, a forensic scientist specializing in firearms identification with the Tennessee Bureau of Investigation (T.B.I.), testified that the bullet found in the ground beneath the victim's head matched the nine millimeter pistol that was entered into evidence. Royce also testified that the interior of the Smith and Wesson .357 Magnum revolver had been drilled out. Royce testified that he believed two weapons were used to kill the victim: a .357 revolver and nine millimeter pistol.

Defendant Jefferson testified that he was twenty-two years old and lived with his parents. Jefferson testified that he did not know about the victim's death until he was arrested on November 5, 1997. Jefferson stated that he had never seen or heard of the victim before November 5, 1997. When questioned about where he was on the day of the murder, Jefferson testified that he did not know. Jefferson also testified that he did not know Larry Johnson and had never heard of him before November 5, 1997.

Jefferson testified that he had been a member of the [Gangster] Disciples since 1994, when he was seventeen years old. Jefferson testified that he did not hold a position within the organization. Jefferson testified that in 1995 he was charged with robbery and gave a statement against his co-defendant, also a member of the [Gangster] Disciples. According to Jefferson, Glass contacted Jefferson and told him that "since [he] gave a statement, at that time [he] was told to take that charge for the robbery and let the co-defendant loose." Jefferson testified that he did not believe he had a choice and that he had to take the charge. Jefferson testified that when he made it known in 1995 that he wanted out of the organization, Glass told him that he had to "suffer the consequences." Jefferson testified that the consequences were death or being put into a situation to "get caught up." Jefferson testified that he did not know what positions Glass and Phillips held in the [Gangster] Disciples, but he knew they "ranked high."

Defendant Larry Johnson testified that he played the organ at Al Green's church in Memphis. Johnson testified that he often visited his cousin Ira Farris, who lived with Tony Phillips and Totti Brown. Johnson testified that Phillips also cut his hair sometimes. Johnson testified that he did not know that Phillips was a member of the [Gangster] Disciples. Johnson

-8-

testified that met Marcus Glass at Phillips' residence. Johnson stated that he sometimes transported Glass to the Hurt Village apartment complex because both of their girlfriends lived there. Johnson testified that he also did not know that Glass was a member of the [Gangster] Disciples.

Johnson testified that he met Robert Walker for the first time at the preliminary hearing. Johnson testified that he had met Raniko Bonner when he took Phillips to her apartment. Johnson further testified that he did not know Jefferson before he was arrested, and he maintained that he had only met the victim once. Johnson testified that he did not go to Bonner's apartment during the day on November 3, 1997, but he admitted that he did go there that night.

Johnson testified that on November 4, 1997, he saw Glass walking, so he gave him a ride. Glass asked if he could put a bag in the trunk. Johnson said that he eventually dropped Glass off at Kingsgate Apartments. Johnson testified that his car was having some problems, so on November 4, 1997, he took the car to Phillips' apartment complex because Phillips and Farris knew some mechanics that would work inexpensively.

When Johnson returned to work on Saturday, the car still was not fixed. The mechanic told Johnson that he needed a wrench, so Johnson testified that he looked in his trunk to find one. When Johnson looked in the trunk, he saw that Glass' bag was still there. Johnson testified that he went through the bag and found a gun. Johnson testified that he went inside and told Phillips that Glass left a gun in his car. According to Johnson, Phillips told him that he couldn't bring the gun inside, so Johnson put the gun back in the trunk of his car.

Johnson testified that he was driving his car on the night of November 3, 1997. Johnson testified that he was with his brother on the night of the murder; however, his brother failed to testify as to Johnson's whereabouts on that night. Johnson testified that he was at Phillips' residence when the police beeped him. Johnson stated that nobody answered when he called the number on his beeper. Johnson recalled that after attempting to return the call, he left.

Totti Brown, Tony Phillips' roommate at the time of the offense, testified that Johnson and Jefferson frequently came to her apartment to see Phillips. Brown testified that on November 9, 1997, she was at home with Phillips and Johnson. At some point during the day Johnson received a page. Brown recalled that Johnson called the number on the pager, but nobody

answered. According to Brown, Johnson then told Phillips that he was going to leave because "he didn't know what was going on." Brown testified that Phillips left about thirty minutes later. Soon thereafter, the Memphis Police Department arrived looking for Johnson.

Debra Falasco testified that she works for the Title Division of the Shelby County Clerk's Office. As part of her job, Falasco is custodian of vehicle ownership records in Shelby County. Falasco testified that on October 21, 1997, Larry Johnson applied for a title on a blue 1984 Buick LeSabre. The license plate number in her records matched the one on Larry Johnson's car.

Dr. Wendy Gunther, Medical Examiner for Shelby County, performed the autopsy on the victim. Dr. Gunther testified that the cause of death was gunshot wounds to the victim's head, neck, and torso. Dr. Gunther testified that probably six or seven bullets went through the victim's body. According to Dr. Gunther, two bullets went through the victim's head.

*Id*. at *1-7.

The Petitioner sought post-conviction relief, alleging the ineffective assistance of counsel related to the failure to request a jury instruction for the lesser included offenses to first degree murder. The post-conviction court denied relief, and this court affirmed the post-conviction court's determinations. *See Larry Johnson v. State*, No. W2006-00345-CCA-R3-PC, 2007 WL 2120184 (Tenn. Crim. App. July 24, 2007), *perm. app. denied* (Tenn. Dec. 26, 2007).

On June 12, 2014, the Petitioner filed a petition for a writ of error coram nobis, alleging that the State "violated '*Brady*' by withholding exculpatory evidence of leniency that was given to . . . 'Robert Walker' in exchange for his testimony." The petition also alleged that the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963), by withholding impeachment information related to the leniency Mr. Walker received for his cooperation with the State in multiple homicide cases involving defendants who were Gangster Disciples members. The petition alleged that Mr. Walker's federal grand jury testimony showed that Mr. Walker and then-Assistant District Attorney General Terry Harris, the prosecutor in the Petitioner's case, "discussed cooperation and consideration . . . at a later date." Likewise, the petition alleged that Mr. Walker implicated himself in the killing for which the Petitioner was convicted, that Albert Cleveland Wilson's police statement implicated Mr. Walker in the unrelated homicide of Billy Ray Brown, and that Mr. Walker was never charged for his roles in these killings. The Petitioner attached multiple documents to his post-conviction petition, including transcripts from a federal grand jury proceeding in which Mr. Walker testified and from a post-conviction hearing relative to "Matrin Becton," who was likewise a member of

Gangster Disciples and was convicted of killing Marshall Shipp. The Petitioner argued that due process of law required tolling the one-year statute of limitations.

At the evidentiary hearing, coram nobis counsel argued that Mr. Walker testified at the Petitioner's trial about the structure of the Gangster Disciples organization and that Mr. Walker implicated himself in multiple offenses for which Mr. Walker was not prosecuted. Counsel stated that Mr. Walker received "extremely lenient" sentences for the offenses of which he was convicted and noted that the trial judge stated at Mr. Walker's guilty plea and sentencing hearing that the court was aware of Mr. Walker's testimony "in all these other trials to convict all these other alleged Gangster Disciples" and that Mr. Walker's testimony was the reason the State agreed to "such a good deal." Counsel argued that this evidence was exculpatory.

The prosecutor told the coram nobis court that no evidence showed Mr. Walker had an agreement with the State before Mr. Walker testified at the Petitioner's trial. Coram nobis counsel said that although no formal written agreement existed before the Petitioner's trial, Mr. Walker did not testify based upon altruism. Counsel argued that although the defense received a redacted transcript of Mr. Walker's federal grand jury testimony, counsel had only recently received an unredacted transcript showing that Mr. Walker implicated himself in multiple criminal offenses for which Mr. Walker was never charged. Counsel argued this evidence was "exculpatory impeachment material" and was not provided to trial counsel. Coram nobis counsel argued that the basis for the Petitioner's claim was not that Mr. Walker had a formal agreement with the State before testifying at the Petitioner's trial but, rather, that Mr. Walker cooperated extensively with the police and the prosecutor with the expectation that he would receive favorable treatment. Counsel told the court that Mr. Walker received favorable treatment based upon the offenses for which Mr. Walker was charged and the sentences Mr. Walker received.

The transcript from Mr. Walker's guilty plea hearing and the judgments of conviction were received as exhibits. Although Mr. Walker was charged with two counts of aggravated robbery, he pleaded guilty as a Range I, standard offender to two counts of facilitation of robbery. Mr. Walker received concurrent sentences of two years for each offense, and at the time of the guilty plea hearing, Mr. Walker had earned two years' jail credit. The transcript reflects that the charges related to a robbery of "the Corn Beef House" in which two of three perpetrators were armed and in which nobody was harmed. Terry Harris, the prosecutor, stated that the plea agreement was "based largely on [Mr. Walker's] cooperation which I think is certainly well-documented from testifying in trials . . . as well as the Federal Grand Jury." The trial court stated that due to Mr. Walker's "extraordinary testimony in several cases . . . in which that testimony was given – what I feel certain was and is and will continue to be great personal risk involved in giving that testimony, I will accept these guilty pleas as amended." The court imposed sentencing in accord with the plea agreement and

noted "that, of course, is a time-served situation."

The unredacted September 22, 1998 federal grand jury transcript was received as an exhibit and reflects that then-United States Assistant Attorney General John Fowlkes questioned Mr. Walker and that then-Shelby County Assistant District Attorney General Terrell L. Harris was present during the proceeding. After Mr. Walker was instructed about his obligations and constitutional rights, Mr. Fowlkes asked, "And I believe there's an arrangement that you have with Mr. Harris regarding your testimony." Mr. Walker responded, "Yes, sir." Upon questioning by Mr. Harris, Mr. Walker testified that he had been in police custody since November 1997 relative to two aggravated robbery charges, and when asked if "we made any promises . . . about how much time" he would serve for these charges in exchange for his grand jury testimony, Mr. Walker responded, "No, sir." Mr. Walker denied that he had "any specific deal regarding [his] testimony at this point" and agreed that he hoped his "cooperation in this matter will result in some consideration . . . on the handling of those charges." Mr. Walker confirmed that he and the prosecutors had discussed "consideration" several times but that no promises had been made about the "specific lengths of time."

Mr. Walker testified before the grand jury regarding the structural hierarchy of the Memphis-based Gangster Disciples organization. In relevant part, Mr. Walker testified that he was a chief of security and reported to the leader and overseer, Tony Phillips, that codefendant Jefferson was also a chief of security, and that the Petitioner was an assistant to codefendant Jefferson. Mr. Walker identified various positions within the organization, the persons who held the positions, and the responsibilities of the positions. Mr. Walker stated that he investigated rule violations and that punishment depended upon the violation. Mr. Walker stated that cooperating with the police resulted in a death sentence ordered by the overseer. Mr. Walker provided information relative to the killing of Gangster Disciples member Marshall Shipp and stated that "Matron Beckton"[2] admitted to Mr. Walker that Mr. Phillips, the overseer, ordered him to kill Mr. Shipp.

Relative to the homicide involving the Petitioner, Mr. Walker testified that the overseer issued a "kill on sight" order based upon Mr. Hailey's cooperation with the police. Mr. Walker testified that on the night of the killing, he, codefendant Jefferson, and Mr. Phillips were at Mr. Phillips's girlfriend's apartment, and that the Petitioner and codefendant Marcus Glass arrived at the apartment with Mr. Hailey. Mr. Walker stated that the Petitioner possessed a .357-caliber revolver, that codefendant Glass possessed a nine-millimeter handgun, that the Petitioner and codefendant Glass told Mr. Phillips that the victim was

---

[2] Although the spelling of the name in the grand jury transcript is reflected in quotations, it is clear from the record that Matron Beckton, Matrin Becton, and Marcus Becton refer to the same person and to the person who testified at the Petitioner's error coram nobis hearing.

inside their car, that Mr. Phillips winked his right eye, and that the wink meant Mr. Hailey "ha[d] to be killed." Mr. Walker stated that he intended to leave with the Petitioner and codefendant Glass but that Mr. Phillips told Mr. Walker to remain at the apartment. Mr. Walker said that the Petitioner, codefendant Jefferson, and codefendant Glass left the apartment with Mr. Hailey. Mr. Walker said that as the Petitioner left the apartment, the Petitioner said, "We're fixing to go kill this dude."

Mr. Walker testified that he spoke to the Petitioner the following day, that the Petitioner wanted to "bring up charges" against codefendant Glass because the Petitioner and codefendant Jefferson killed Mr. Hailey, while codefendant Glass merely sat inside the car. Mr. Walker stated that the Petitioner admitted shooting Mr. Hailey twice and said codefendant Jefferson shot Mr. Haley multiple times while smoking a cigarette. Mr. Walker stated that after the shooting, the Petitioner drove to Mr. Phillips's home to have the "guns drilled," which Mr. Walker described as drilling the barrel of a gun. Mr. Walker stated that the Petitioner was instructed by Mr. Phillips to tell the police that codefendant Glass "did it" because codefendant Glass was to blame for "everybody . . . getting picked up" by the police. Mr. Walker stated that later Mr. Phillips discussed blaming the Petitioner for Mr. Hailey's killing because Mr. Glass left for Chicago without intending to return to Memphis and because the Petitioner had told his girlfriend about the killing.

Coram nobis counsel stated that the federal grand jury transcript showed that Terry Harris, the prosecutor in the Petitioner's case, was present during Mr. Walker's testimony. Counsel argued that trial counsel only knew Mr. Walker had been charged with two aggravated robberies. Coram nobis counsel asserted that not only were pending criminal charges relevant *Brady* material but that the defense had a right to know about Mr. Walker's uncharged criminal conduct pursuant to *Brady*. Counsel said that he learned Mr. Walker testified at additional criminal trials and told the court that although Mr. Walker was not charged in the Petitioner's case, Mr. Walker implicated himself in this case during his federal grand jury testimony. Counsel said that Mr. Walker cooperated with federal prosecutors in an effort to build a case against Tony Phillips, the leader and overseer of Gangster Disciples.

The coram nobis court noted that federal grand jury proceedings were initially secret, that Mr. Harris could have been disciplined for disclosing federal grand jury testimony, and that disclosure could have potentially endangered lives. Coram nobis counsel noted, though, that the prosecutor provided the defense redacted copies of the federal grand jury transcript during the Petitioner's trial. The court reviewed a portion of the transcript from the grand jury proceeding and noted that the transcript reflected Mr. Walker testified that he and the State had not entered into an agreement regarding his pending aggravated robbery charges. The court also noted that the transcript did not reflect any discussions regarding Mr. Walker's uncharged criminal conduct, and counsel told the court that Mr. Walker was not charged in the Petitioner's case. The court stated that whether Mr. Walker testified against

-13-

other defendants was irrelevant to the Petitioner's case. Counsel noted that Mr. Walker's grand jury testimony included references to the Petitioner and that the portion of the grand jury transcript not provided to trial counsel was inconsistent with Mr. Walker's testimony at the Petitioner's trial.

The transcript relative to Mr. Walker's testimony at the Petitioner's trial was received as an exhibit and reflected that Mr. Walker testified that he had been in confinement since his arrest for two counts of aggravated robbery, that the State had not "promised any specific number of years," and that he "hope[d] his cooperation will be taken into consideration in the handling of those cases." Mr. Walker testified that he provided police statements to detectives in the anti-gang and homicides units. Mr. Walker's testimony was consistent with his federal grand jury testimony regarding the structure and organization of Gangster Disciples and about the events related to Mr. Hailey's killing, with the exception that the federal grand jury transcript incorrectly showed that Mr. Phillips ordered that Mr. Hailey's killing be blamed on the Petitioner. Mr. Walker testified at the trial that Mr. Phillips ordered that the Mr. Hailey's killing be blamed on codefendant Glass, who also testified at the Petitioner's trial and was present during the homicide.

At the conclusion of Mr. Walker's direct examination, trial counsel for codefendant Jefferson requested *Jencks* material and a recess to review the documents. When court resumed, trial counsel for the Petitioner told the court that the materials included more than 100 pages of information and requested that the court break for lunch to give counsel time to review the materials. Counsel for codefendant Jefferson told the court that he had received "a copy of this and part of the Federal Grand Jury testimony yesterday" and did not have "much to do." Counsel for the Petitioner stated that he had not seen any of the materials. No additional information in the trial transcript described with specificity what was provided to the defense. The court provided a lunch break in order for the defense to review the materials.

On cross-examination by codefendant Johnson's trial counsel, Mr. Walker testified that he assaulted gang members for violating organizational rules, that he also went by the name "Robert Macklin," and that he had provided the false name to police previously, although he did not consider it lying to the police. On cross-examination by the Petitioner's trial counsel, Mr. Walker admitted he had been arrested for two counts of aggravated robbery and had previous convictions for larceny from a person, theft, and assault with a deadly weapon. Mr. Walker agreed he "expect[ed] consideration of [his] testimony in this case" and said that he had "testified in other cases for the government." Mr. Walker agreed that his aggravated robbery charges were pending at the time of the trial. The Petitioner's counsel presented Mr. Walker's preliminary hearing testimony in which Mr. Walker stated that when robbery detectives asked him if he wanted to make a statement regarding the aggravated robbery charges, Mr. Walker said, "What do I need to make a statement for? . . . You all

-14-

need me. I'm the one that can solve all the murders."

At the Petitioner's coram nobis hearing, Marcus Becton testified that, in 1997, he was convicted of murder and that his defense theory was that the killing had been ordered by the Gangster Disciples. Mr. Becton said that Mr. Walker testified at his trial regarding the gang's membership, structure, procedures, and how specific murders occurred. Mr. Becton said that he sought post-conviction relief based upon his attorney's learning that Mr. Walker had testified before a federal grand jury.

Mr. Becton testified that during his confinement between 2013 and 2015, he and the Petitioner "cross[ed] paths." Mr. Becton said that, in 2013 or 2014, he and the Petitioner learned that a mutual friend in the prison helped each of them with their respective cases. Mr. Becton stated that after he reviewed the materials, including Mr. Walker's federal grand jury testimony, provided by Mr. Becton's post-conviction counsel, Mr. Becton provided the materials to the Petitioner. Mr. Becton said that his post-conviction counsel had difficulty obtaining the federal grand jury transcript and that the Petitioner had not seen the materials previously. Mr. Becton recalled that his post-conviction counsel "jumped through a lot of hoops" to obtain the grand jury transcript, that counsel obtained a court order for the transcript, that the United States Attorney's Office challenged the court order, and that, ultimately, counsel obtained the transcript.

Mr. Becton testified that Terry Harris, the prosecutor assigned to his case, testified at Mr. Becton's post-conviction hearing. Mr. Becton said that he provided the transcript from his post-conviction hearing, containing information about Mr. Walker, to the Petitioner. Mr. Becton said that his post-conviction counsel also provided him "statements that implicat[ed] Robert Walker in a couple different – three different homicides" but that he was unsure if the Petitioner received the statements.

On cross-examination, Mr. Becton agreed that Mr. Walker testified at his trial that the prosecutor had not offered Mr. Walker anything in exchange for Mr. Walker's testimony. Mr. Becton said, though, that the federal grand jury transcript showed a colloquy of "what was going on between Terry Harris and Robert Walker" and that Mr. Walker responded affirmatively when asked if he had an agreement with Mr. Harris. Mr. Becton thought he received the grand jury transcript in 2013. Mr. Becton agreed that his trial occurred in 1999, that his trial counsel knew Mr. Walker had two pending aggravated robbery charges at the time of Mr. Becton's trial, that trial counsel cross-examined Mr. Walker about whether he and the State had entered into a plea agreement, and that Mr. Walker denied the existence of any agreement and the promise of consideration. Mr. Becton said that although he was unsure of the specific words, Mr. Walker expressed a desire for leniency. Mr. Becton denied

that, in the grand jury proceeding, Mr. Walker referenced testifying for the State in additional cases involving Gangster Disciples.

Mr. Becton testified that in 1999, he did not know the Petitioner personally, although the Petitioner's name was familiar. Mr. Becton admitted that he and the Petitioner were members of Gangster Disciples and agreed that Mr. Walker's connection to the same organization prompted Mr. Walker's testimony against the Petitioner and against Mr. Becton.

Mr. Becton testified that the federal grand jury transcript reflected that Mr. Walker and Mr. Harris had "an understanding that if you help me, I'll help you" and that Mr. Walker and Mr. Harris had discussed this understanding multiple times. On redirect examination, Mr. Becton testified that although the grand jury proceedings occurred in 1998, he learned of the transcript in 2013.

Upon questioning by the coram nobis court, Mr. Becton testified that his murder conviction was unrelated to the Petitioner's case and that Mr. Walker testified for the State in three cases. Mr. Becton stated that the 1998 federal grand jury proceeding occurred before his and the Petitioner's trials and that Mr. Becton first learned of the grand jury proceeding in 2013 when his post-conviction counsel obtained a transcript. Mr. Becton said that the federal grand jury proceeding was prosecuted by John Fowlkes, involved all three State cases in which Mr. Walker testified, and provided the basis for the federal indictment of Mr. Phillips. Mr. Becton stated that based upon the Gangster Disciples' hierarchy, Mr. Walker was immediately below Mr. Phillips and that Mr. Walker was always present during conversations related to criminal offenses. Mr. Becton stated that Mr. Walker's grand jury testimony was "a tell-all book" in which Mr. Walker told the grand jury everything he knew.

Although not authenticated and received as an exhibit, a transcript from Mr. Becton's August 27, 2013 post-conviction proceeding was attached to the petition for coram nobis relief. The transcript reflects that Shelby County Assistant District Attorney General Terry Harris testified. The parties at the Petitioner's post-conviction hearing agreed that Mr. Harris was the prosecutor at the Petitioner's and Mr. Becton's trials. Mr. Harris testified that he was the prosecutor in Mr. Becton's case, that he worked with Assistant United States Attorney Fowlkes, and that fifteen defendants were involved in "this case."[3] At Mr. Becton's post-conviction hearing, a pretrial motion transcript was received as an exhibit but was not included in the present appellate record. The motion was filed by Mr. Becton's codefendant, who was also connected to the Gangster Disciples cases prosecuted by Mr. Harris. After reviewing the motion hearing transcript, Mr. Harris stated that during the pretrial hearing, the

---

[3] The record is ambiguous relative to whether "this case" refers only to the killing of Mr. Shipp for which Mr. Becton was convicted or to all of the Gangster Disciples-related killings prosecuted around the same time.

trial court determined that the prosecution was required to disclose to defense counsel whether the State had entered into a formal agreement with a defendant who testified against another defendant. Mr. Harris also stated that the motion hearing transcript reflected that the trial court determined that the prosecution was also required to disclose whether it told a defendant and a witness that he or she was "welcome to testify, and if you do, then we'll consider your case afterwards, no promises."[4]

Mr. Harris testified that Mr. Walker was not identified as a witness on the indictment in Mr. Becton's case but that the "indictment worksheet" provided to the defense identified Mr. Walker as a witness. Mr. Harris stated that he offered to provide defense counsel with a summary of Mr. Walker's prospective testimony. Mr. Harris recalled that Mr. Becton and Mr. Walker were confined together and that Mr. Walker testified at Mr. Becton's trial that Mr. Becton admitted killing Mr. Shipp. Mr. Harris said he provided the defense a transcript of Mr. Walker's grand jury testimony pursuant to *Jencks* after Mr. Walker testified on direct examination. Mr. Harris identified Mr. Walker's November 1997 police statement referring to Mr. Hailey's and Mr. Shipp's killings and said that the statement was provided to Mr. Becton's defense counsel pursuant to *Jencks* at the trial, not pursuant to *Brady* during discovery.

Likewise, at Mr. Becton's post-conviction proceeding, Mr. Harris identified Albert Cleveland Wilson's police statement, in which Mr. Wilson implicated Mr. Walker in the killing of Mr. Brown. Mr. Harris denied that he provided Mr. Walker with any promise of a specific number of years and stated that Mr. Walker confirmed at the guilty plea hearing that the State did not make any promises to Mr. Walker and that Mr. Walker hoped to receive consideration based upon Mr. Walker's testimony. Mr. Harris stated that Mr. Walker was not charged in relation to Mr. Hailey's, Mr. Shipp's, and Mr. Brown's homicides.

Mr. Walker's attorney at the time of Mr. Becton's and the Petitioner's trials testified at Mr. Becton's post-conviction proceeding that he would not allow Mr. Walker to talk to any attorney representing a defendant against whom Mr. Walker intended to testify. The attorney reviewed Mr. Wilson's police statement and stated that he had no knowledge of Mr. Wilson's allegation that Mr. Walker was involved in the killing of Mr. Brown. The attorney stated that Mr. Walker never discussed involvement in any murder and that Mr. Walker was only charged with two counts of aggravated robbery. The attorney said that he had never seen a transcript of Mr. Walker's federal grand jury testimony but that he knew of the

---

[4] Originally, at least fifteen people were charged with Mr. Shipp's murder, and at the motion hearing, multiple defense attorneys were present. It is unclear from the present record which codefendant filed the pretrial motion relative to the State's providing consideration to codefendants and witnesses in exchange for testimony. *See Matrin Becton v. State*, No. W2014-00177-CCA-R3-PC, 2015 WL 1912924, at *4-5 (Tenn. Crim. App. Apr. 28, 2015), *perm. app. denied* (Tenn. Jan. 19, 2016).

testimony. The attorney knew Mr. Walker provided the police with multiple statements but that the attorney had not seen them. The attorney believed that Mr. Harris would have provided the grand jury transcript and Mr. Walker's police statements if the attorney had asked for them. The attorney said that he did not know Mr. Walker's and Mr. Wilson's police statements implicated Mr. Walker in homicides and agreed that Mr. Wilson's statement was *Brady* material. The attorney knew that Mr. Walker testified at multiple trials involving members of Gangster Disciples and said he was not present when Mr. Walker testified at those trials. The attorney said that during his representation of Mr. Walker, Mr. Harris never mentioned that Mr. Walker was involved in any murders.

Mr. Becton's trial counsel testified at Mr. Becton's post-conviction proceeding that initially counsel did not know the State intended to present Mr. Walker as a trial witness and that Mr. Walker "pop[ped] out of nowhere with information about what happen[ed] and . . . [Mr. Becton's] involvement in all this." Counsel said that he did not know how Mr. Walker "fit into this case," that Mr. Walker's attorney denied counsel's request to speak with Mr. Walker, that counsel could not associate any of the nicknames in the limited discovery materials to Mr. Walker, and that Mr. Walker "was like a ghost basically." Counsel said that if Mr. Walker had been implicated in uncharged criminal conduct, the prosecutor would have been the only person who could have provided this information to counsel.

Mr. Becton's trial counsel testified that, during the trial, counsel received a redacted transcript of Mr. Walker's grand jury testimony. Counsel stated that he requested an unredacted copy of the transcript after Mr. Walker's testimony and that the trial court reviewed an unredacted transcript and determined counsel could only have access to information related to Mr. Becton's trial, not testimony related to other cases. After reviewing an unredacted grand jury transcript, counsel stated that the trial court ordered the prosecution to disclose the type of consideration described in the transcript. Counsel said that Mr. Walker's testimony was a "huge factor" in the case against Mr. Becton because Mr. Walker was the only witness who could testify that Mr. Becton admitted involvement in the homicide. Counsel said that if he had known Mr. Walker implicated himself in multiple homicides and gang-related criminal activity but had not been charged for those offenses, counsel would have used the information to impeach Mr. Walker.

Mr. Becton's trial counsel reviewed a statement in which Mr. Walker discussed Mr. Hailey's murder, of which the Petitioner was convicted. Counsel said that he could have used this information to impeach Mr. Walker at Mr. Becton's trial to show that Mr. Walker was involved in a homicide but had not been charged. Counsel noted, though, that the facts involving the homicides for which the Petitioner and Mr. Becton were convicted had similar facts. Counsel recalled, however, that Mr. Becton only denied being involved in the killing and that Mr. Becton never denied being present during the killing. Counsel said, though, that

-18-

he had not heard of Mr. Hailey until the morning of counsel's post-conviction hearing testimony. Counsel said that he was entitled to have this information to impeach "a key witness" to the extent of showing the appearance of a "deal" with the State, impacting Mr. Walker's bias. Counsel conceded the evidence was not exculpatory.

Mr. Becton's trial counsel reviewed a statement in which Mr. Wilson implicated Mr. Walker in Mr. Brown's homicide and stated that the post-conviction hearing was the first time he had seen the statement. Counsel said that the statement did not exculpate Mr. Becton but that it served as impeachment material relative to Mr. Walker. Counsel recalled that Mr. Walker "painted himself as a good guy who was doing this out of the kindness of his heart," claimed to have helped children stay out of trouble, and "pawn[ed] everything off on everyone else." Counsel said that he could have called Mr. Wilson to testify at Mr. Becton's trial to show Mr. Walker's bias, although Mr. Wilson's statement would not have been admissible. Counsel said he would have questioned Mr. Walker about whether he was "given a pass" relative to the uncharged homicide because of Mr. Wilson's police statement implicating Mr. Walker.

After reviewing the Petitioner's trial transcript, the coram nobis court determined that Mr. Walker's federal grand jury testimony was provided to the defense pursuant to *Jencks*. The court found that, as a result, Mr. Walker's federal grand jury testimony was not newly discovered evidence, and it denied relief on this basis. The court rejected the Petitioner's testimony that he first learned of the federal grand jury transcript from Mr. Becton in 2013.

Relative to the Petitioner's allegation that the State's decision not to charge Mr. Walker in various gang-related criminal offenses, including homicide, was relevant for impeachment purposes, the coram nobis court reviewed Albert Cleveland Wilson's January 14, 1998 police statement. Mr. Wilson did not testify at the Petitioner's trial or coram nobis hearing, but Mr. Wilson's 1998 statement related to the 1997 homicide of Mr. Brown and aggravated assaults of Travis Sugars and Andre Jackson. In the statement, which was received as an exhibit, Mr. Wilson said that Mr. Walker and Wilson Neely were responsible for Mr. Brown's killing. Mr. Wilson identified Mr. Walker as the chief of security who was "the hit man" who "kill[ed] people." Mr. Wilson denied killing Mr. Brown. Records from the Shelby County Criminal Court Clerk's Office, also received as an exhibit, reflect that Wilson Neely was convicted after a trial of the first degree murder of Mr. Brown and that a first degree murder charge against Albert Cleveland Wilson was dismissed without the assessment of court costs. The record reflects that in addition to Albert Cleveland Wilson and Wilson Neely, Ira Farris and Robert Seymour were also indicted in connection with Mr. Brown's killing and that the charges against Mr. Ferris and Mr. Seymour were likewise dismissed. In the statement, Mr. Wilson described Mr. Neely's shooting Mr. Brown with an automatic firearm and said Mr. Brown fell on the ground after being shot in the "upper body." Mr. Wilson stated that afterward, Mr. Walker fired three shots at Mr. Brown's head

while stating "POW, POW, POW." Mr. Wilson stated that although Mr. Walker was chief of security, Mr. Wilson did not know if Mr. Walker had killed anyone else.

Coram nobis counsel argued that Mr. Wilson's police statement explained Mr. Walker's involvement in Mr. Brown's killing and that, as a result, the defense was entitled to receive the statement for impeachment purposes pursuant to *Brady*. Counsel argued that the materials were relevant to Mr. Walker's bias because the State knew about Mr. Walker's violent criminal conduct but chose not to charge Mr. Walker for the killing and to significantly reduce the two charged offenses.

The coram nobis court found that Mr. Walker was "some kind of officer in this organization" and that Mr. Walker testified regarding "everyone's involvement," including Mr. Walker's involvement. The court found that Mr. Walker "was an accomplice, pretty much, to almost everything that he was ratting out." The court found that the jury would have deduced that Mr. Walker was "a gang banging, probably murdering son of a gun himself." The court found that Mr. Walker made a flow chart of the Gangster Disciples' hierarchy during his testimony at the Petitioner's trial and that Mr. Walker's testimony showed he was "part and parcel" of "all these murders" and "was an accomplice to all of them." The court found that it was "probably common knowledge" that Mr. Walker was involved in Mr. Brown's homicide, as discussed by Mr. Wilson. Counsel told the court that the Petitioner learned of Mr. Wilson's 1998 statement from Mr. Becton in 2013, and the State argued that the statement was not material and would not have impacted the outcome of the Petitioner's trial.

The coram nobis court found that no evidence supported the Petitioner's allegation that Mr. Walker was not charged in "this murder because he was willing to testify to all these other murders." The court found that the criminal conduct involving Mr. Walker would have needed to be crimes of dishonesty, not crimes of violence, in order for the defense to have been permitted to question Mr. Walker. The court found that even if the Petitioner had not known about Mr. Wilson's police statement implicating Mr. Walker in Mr. Brown's killing, Tennessee Rule of Evidence 608 would have prevented the admission of the evidence.

The coram nobis court found that the evidence did not show that Mr. Walker witnessed the killing for which the Petitioner was convicted, and the parties agreed that codefendant Glass, an accomplice, was the only person who witnessed the shooting. Relative to Mr. Wilson's statement implicating Mr. Walker in Mr. Brown's death, the court found that the evidence did not show that Mr. Harris, the prosecutor in the Petitioner's case, knew about Mr. Wilson's police statement. The court found that even if Mr. Harris worked on both cases, the Petitioner would not have been permitted to impeach Mr. Walker with "uncharged, unsubstantiated, unconvicted conduct" because the alleged conduct did not involve crimes of dishonesty. The court found that Tennessee Rules of Evidence 608 and

609 would have prohibited any impeachment of Mr. Walker.

The coram nobis court found that Mr. Becton's testimony was not credible. The court, likewise, discredited the Petitioner's testimony after determining that the Petitioner received a copy of the grand jury transcript before his trial. The court stated it was "not satisfied that this couldn't have been found to begin with" and that the Petitioner was without fault. The court found that the Petitioner lied about when he learned about the grand jury transcript. Relative to Mr. Wilson's and Mr. Walker's police statements, the court found that the evidence would not have been admissible pursuant to the Rules of Evidence. The court found that Mr. Wilson could not have testified at the Petitioner's trial, and that even if Mr. Wilson could have been asked about Mr. Walker, the outcome of the Petitioner's trial would not have been different because Mr. Wilson was not a witness to the killing in the Petitioner's case. The court found that the jurors would not have been "surprised" that Mr. Walker had been involved in other homicides because Mr. Walker was a high-ranking gang member who knew details about the gang's operations and structure. The court noted that Mr. Wilson was convicted of killing Mr. Shipp, who was another member of Gangster Disciples, and received a life sentence.

The coram nobis court's written order reflects that the court denied relief because the trial transcript showed that the federal grand jury transcript was provided to the defense during the trial and because Mr. Wilson's statement implicating Mr. Walker in an unrelated murder would not have been admissible at the Petitioner's trial. The court found that even if Mr. Wilson's statement would have been admissible, the statement would not have impacted the outcome of the trial. This appeal followed.

The Petitioner contends that the coram nobis court erred by denying relief. He argues that newly discovered evidence shows that the State withheld "valuable impeachment evidence" relative to Mr. Walker's extensive cooperation with the prosecution to secure multiple convictions in gang-related homicides in exchange for significantly reduced charges and sentences. The State responds that the Petitioner has waived appellate consideration of the issue and that alternatively, the coram nobis court did not err by determining that tolling of the statute of limitations was not warranted and that the Petitioner was not entitled to relief.

A writ of error coram nobis lies "for subsequently or newly discovered evidence relating to matters which were not litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial." T.C.A. § 40-26-105(b) (2012); *State v. Hart*, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995); *see Cole v. State*, 589 S.W.2d 941 (Tenn. Crim. App. 1979). The purpose of a coram nobis proceeding "is to bring to the attention of the court some fact unknown to the court, which if known would have resulted in a different judgment." *State ex rel. Carlson v. State*, 407

-21-

S.W.2d 165, 167 (Tenn. 1966). The decision to grant or deny such a writ rests within the sound discretion of the court. *Jones v. State*, 519 S.W.2d 398, 400 (Tenn. Crim. App. 1974); *see Teague v. State*, 772 S.W.2d 915, 921 (Tenn. Crim. App. 1988). A petition for a writ of error coram nobis must be filed within one year of the judgment becoming final in the trial court. *State v. Mixon*, 983 S.W.2d 661, 670 (Tenn. 1999). A judgment becomes final "thirty days after its entry in the trial court if no post-trial motions are filed or upon entry of an order disposing of a timely filed, post-trial motion." *Harris v. State*, 301 S.W.3d 141, 144 (Tenn. 2010). A limited exception to the statute of limitations exists when due process requires tolling. *Workman v. State,* 41 S.W.3d 100, 103 (Tenn. 2001).

"When a petitioner seeks a writ of error coram nobis based on newly discovered evidence of actual innocence, due process considerations may require tolling of the statute of limitations." *Harris*, 301 S.W.3d at 145 (citing *Workman*, 41 S.W.3d at 101). "[B]efore a state may terminate a claim for failure to comply with procedural requirements such as statutes of limitations, due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner." *Burford v. State*, 845 S.W.2d 204, 208 (Tenn. 1992); *see Workman*, 41 S.W.3d at 102. However, a petitioner "must exercise due diligence in presenting the claim." *Harris*, 301 S.W.3d at 144. Whether due process principles require tolling the statute of limitations is a mixed question of law and fact and is reviewed de novo with no presumption of correctness. *See Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006).

As a preliminary matter, the State argues initially that the Petitioner has waived appellate review of the coram nobis court's determinations. The State argues that in the petition, the sole basis for relief was that the federal grand jury transcript showed that an agreement between the prosecutor and Mr. Walker existed before the Petitioner's trial and that the State withheld evidence of the agreement. The State asserts that "on appeal, this has morphed into a claim that the transcript merely shows 'extensive involvement and cooperation' with law enforcement and that the State simply withheld the 'true scope' of Mr. Walker's assistance in other cases" involving Gangster Disciples members. However, the petition for relief specifically alleged that the prosecution violated *Brady v. Maryland* by withholding impeachment information related to the leniency Mr. Walker received for his cooperation with the State in multiple homicide cases involving defendants who were Gangster Disciples members and that Mr. Walker's federal grand jury testimony showed that Mr. Walker and the prosecutor in the Petitioner's case "discussed cooperation and consideration . . . at a later date." Additionally, the petition alleged that Mr. Walker implicated himself in the killing for which the Petitioner was convicted, that Albert Cleveland Wilson's police statement implicated Mr. Walker in the unrelated homicide of Billy Ray Brown, and that Mr. Walker was never charged for his roles in these killings. The State's argument that the Petitioner has waived appellate review for failure to raise the issue in the coram nobis court is without merit.

The parties do not dispute that the coram nobis petition was filed long after the statute of limitations expired, and we conclude that the record supports a determination that the petition was untimely. Relative to due process tolling, the Tennessee Supreme Court has prescribed a three-part analysis whereby the coram nobis court must

> (1) determine when the limitations period would normally have begun to run; (2) determine whether the grounds for relief actually arose after the limitations period would normally have commenced; and (3) if the grounds are "later-arising," determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim. In making this final determination, courts should carefully weigh the petitioner's liberty interest in "collaterally attacking constitutional violations occurring during the conviction process," *Burford*, 845 S.W.2d at 207, against the State's interest in preventing the litigation of "stale and fraudulent claims." *Id.* at 208.

*Sands v. State*, 903 S.W.2d 297, 301 (Tenn. 1995) (footnote omitted).

In his appellate brief, the Petitioner's argument specifically references Mr. Walker's federal grand jury testimony as a basis for warranting coram nobis relief. He does not refer to or discuss any additional evidence as a basis for relief. As a result, our review is limited to the coram nobis court's determinations regarding Mr. Walker's grand jury testimony.

The record reflects that the coram nobis court determined that the transcript of Mr. Walker's federal grand testimony was not newly discovered evidence because the transcript of the Petitioner's trial reflected that the grand jury transcript was provided to the defense after Mr. Walker's direct testimony. The trial transcript reflects that after Mr. Walker testified on direct examination, the Petitioner's trial counsel and codefendant Jefferson's trial counsel requested *Jencks* material from the prosecutor and a recess to review the material. The court recessed, and when the proceedings resumed, the Petitioner's trial counsel stated that the materials included more than 100 pages and requested an additional recess to review the materials. Codefendant Jefferson's counsel told the trial court that he had received "a copy of this and part of the Federal Grand Jury testimony yesterday." The Petitioner's counsel stated, "I haven't seen any of it yet." The court recessed for lunch to provide counsel with time to read the materials and to prepare for cross-examination. The transcript does not reflect any additional discussions about the contents of the materials provided to counsel.

Although the coram nobis court determined that the grand jury transcript was provided to the defense at the trial, the trial transcript does not reflect whether counsel were provided with a redacted or an unredacted transcript of Mr. Walker's testimony.

-23-

Codefendant Jefferson's trial counsel referenced "a copy of this" and "part" of Mr. Walker's federal grand jury testimony during the trial, but the record does not reflect whether counsel were provided with a redacted or an unredacted transcript of Mr. Walker's testimony. At the coram nobis hearing, the Petitioner did not present the grand jury transcript provided to trial counsel that would have clarified what was and was not provided by the prosecutor. Likewise, the Petitioner did not present testimony from trial counsel or from the prosecutor relative to whether an unredacted or a redacted transcript was provided to the defense. As a result, the coram nobis court was unable to determine whether any portions of the transcript were withheld from the defense pretrial pursuant to *Brady* and during the trial pursuant to *Jencks*. Because the record fails to establish what, if anything, in the grand jury transcript was withheld from the defense, the Petitioner cannot establish that the evidence was newly discovered. Furthermore, because evidence of what consideration the prosecutor provided to Mr. Walker does not exculpate the Petitioner of the first degree murder of Mr. Hailey and because codefendant Glass testified at the trial that the Petitioner shot Mr. Hailey twice in the back when Mr. Hailey attempted to run, it is unlikely that the jury would have reached a different judgment had it been presented evidence of Mr. Walker's bias based upon consideration provided by the prosecutor. As a result, the coram nobis court did not err by denying relief. The Petitioner is not entitled to relief on this basis.

In reaching this conclusion, we have determined that it is unnecessary to consider the coram nobis court's determinations relative to Mr. Wilson's 1998 police statement implicating Mr. Walker in the murder of Mr. Brown. It is noteworthy, however, that the court determined that evidence Mr. Walker was involved in Mr. Brown's killing would have been inadmissible pursuant to Tennessee Rule of Evidences 608 and 609. *See* Tenn. R. Evid. 608 (impeachment by use of specific instances of conduct to establish a witness's character for truthfulness), 609 (impeachment by use of criminal convictions). The record reflects that the court did not consider whether the defense would have been permitted to question Mr. Walker about whether he faced charges related to Mr. Brown's killing, or any additional homicide, in an effort to demonstrate Mr. Walker's bias and prejudice. *See id.*, Rule 616 (impeachment by bias or prejudice); *see also* Neil P. Cohen et al., *Tennessee Law of Evidence* § 6.16[4][b] (6th ed. 2011). Likewise, in reaching our conclusion that the Petitioner is not entitled to relief, we have not considered the transcript of Mr. Becton's post-conviction hearing attached to the pro se coram nobis petition, as it was not authenticated, received as an exhibit, or otherwise relied upon by coram nobis counsel at the evidentiary hearing or on appeal.

In consideration of the foregoing and the record as a whole, the judgment of the coram nobis court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE